DIANNE ADAMS, as Personal Representative and Independent Adm'r of the Estate of Deanna Bell, Deceased, Plaintiff-Appellant, v. FAMILY PLANNING ASSOCIATES MEDICAL GROUP, INC., et al., Defendants-Appellees.

First District (5th Division)   No. 1—98—2583

Opinion filed June 30, 2000.—Rehearing denied August 14, 2000.

534

Hervas, Sotos, Condon & Bersani, P.C., of Itasca (Charles E. Hervas, of counsel), and Myers, Townsend & McKee, of Rosewell, Georgia (David J. Myers, of counsel), for appellant.

Gessler, Hughes & Socol, Ltd., of Chicago (John K. Hughes, Kimberley Marsh, and Frederick S. Rhine, of counsel), for appellees.

JUSTICE QUINN delivered the opinion of the court:

Plaintiff, Dianne Adams, appeals from the trial court's denial of her motion for a new trial, following a jury verdict in favor of defendants.

Plaintiff brought this medical malpractice/wrongful death action to recover damages for the death of her 13-year-old daughter, Deanna Bell, following an abortion under general anesthesia. At trial, plaintiff pursued various negligence claims against the following five defendants: (1) the corporation operating the clinic where the abortion was performed (Family Planning Associates Medical Group, Ltd.) (hereinafter FPA-Chicago), (2) the California corporation that provides management services to the Clinic (Family Planning Associates Medical Group, Inc.) (hereinafter FPA-California), (3) the physician who performed the abortion and who is FPA-Chicago's on-site medical director and part owner (Dr. Lichtenberg), (4) the nonresident owner of FPA-California and part owner of FPA-Chicago (Dr. Allred), and (5) the certified registered nurse anesthetist who provided the general anesthesia for the abortion (CRNA Goode).

On appeal, plaintiff asserts that the trial court erred (1) in refusing to instruct the jury regarding *res ipsa loquitur* and dismissing the counts of the complaint based on that theory; (2) in refusing to instruct the jury that it could consider defendants' internal policies and procedures as evidence of the standard of care; (3) by refusing to allow evidence of the precharting of Deanna Bell's vital signs; (4) in excluding plaintiff's experts' testimony that defendants' expert's research was invalid and biased; (5) in refusing to allow impeachment of defendant Goode by his discovery deposition; and (6) in excluding evidence of defendants' "assembly line" approach to general anesthesia abortion procedures.

For the following reasons, the order of the circuit court denying

plaintiff's motion for a new trial is reversed and the cause remanded to the circuit court.

Deanna Bell was 13 years old at the time of her death. She was approximately 20.5 weeks pregnant and had arranged to have an abortion at FPA-Chicago's Elston Avenue facility on September 3-5, 1992. The abortion procedure used for such second-trimester abortions is called a "Dilation and Extraction" or "D&E" and is performed over the course of three days. On the first and second days, objects called laminaria are placed into the patient's cervix to dilate it. On the third day of the procedure, the actual extraction procedure is performed.

On September 3, 1992, Bell went to the Elston Avenue clinic, where she received and filled out informational and consent forms. The D&E procedure began that same day with the insertion of certain dilating agents (laminaria and Dilapan) into Bell's cervix. Bell was then instructed to return the next day for additional dilation procedures.

On September 4, Bell returned to the Elston Avenue clinic to have additional laminaria inserted by a nurse practitioner. However, the nurse practitioner was unable to remove the laminaria because the dilating devices were too tight, Bell's cervix was immature, and Bell was unable to cooperate by lying still. Bell was sent to the Washington Boulevard facility, where Dr. Lichtenberg was working that day, to have the procedure performed under general anesthesia. In an approximately 20-minute procedure, Dr. Lichtenberg removed the laminaria that had been inserted the day before and inserted new ones. Certified registered nurse anesthetist Larry Hill administered the anesthesia for the procedure.

Bell was given 150 milligrams (mg) of Brevital as an induction dose and three subsequent maintenance doses of 100 mg, 100 mg, and 50 mg. Brevital is a fast-acting barbiturate. Recommended doses, according to the medical literature, for a patient of Bell's weight would have been 53 mg to 70 mg as an induction dose and subsequent maintenance doses of 20 mg to 40 mg every four to seven minutes. In addition to sedating the patient, Brevital also depresses respiration. Thus, during the procedure, CRNA Hill also administered supplemental oxygen to Bell. Bell was told to return to the Elston Avenue clinic at 6:30 a.m. the following day to complete the D&E procedure.

Bell and her mother, plaintiff Adams, returned to the Elston Avenue clinic on September 5. Bell was given anesthesia at 7:40 a.m. Dr. Lichtenberg performed the procedure and CRNA Goode administered the anesthesia.

Before giving anesthesia to Bell, CRNA Goode reviewed her chart, including the anesthesia record from the previous day. The chart re-

corded Bell's age, weight, the procedure that was done, the anesthetic given, and Bell's vital signs both before and during the procedure. After reviewing the chart, CRNA Goode introduced himself to Bell and made a pre-anesthesia assessment. CRNA Goode decided to use a higher level of anesthesia than was used the day before because Bell appeared nervous and because the extraction procedure is more painful than the insertion and removal of laminaria.

During the procedure, CRNA Goode administered 200 mg of Brevital as an induction dose and subsequent maintenance doses totaling 200 mg over the course of the 11-minute procedure. CRNA Goode administered supplemental oxygen only by waving an oxygen mask near Bell's face. A pulse oximeter attached to Bell's finger registered that she had a blood oxygen saturation of 97% throughout the procedure, which is within the normal range. Bell breathed spontaneously throughout the procedure and her blood pressure was steady. At the conclusion of the procedure, Dr. Lichtenberg noted on a health maintenance organization form that Bell's abortion was uneventful, then he left the room to prepare for the next patient's procedure.

Bell was disconnected from the monitoring equipment and CRNA Goode and a medical assistant, Elizabeth Sturm, placed Bell on a gurney to be transferred from the operating room to the recovery room. While Sturm was referred to as a medical assistant, she had never received any type of formal medical education. CRNA Goode placed his hand next to Bell's mouth so he could feel her breath during the transfer. CRNA Goode testified that he saw Bell's chest moving, and he felt and saw that Bell was breathing spontaneously and smoothly. After Bell was in the recovery room, Sturm put a pulse oximeter on Bell's finger and a blood pressure cuff on Bell's arm, then CRNA Goode went into another operating room.

Before obtaining a reading from either of Bell's monitoring devices in the recovery room, Sturm began to write on Bell's medical chart the vital signs Sturm expected to find, rather than Bell's actual vital signs. This practice is called "precharting." While Sturm was precharting, the pulse oximeter beeped, indicating that it was not getting a reading. Sturm removed the device from Bell's finger and checked its operation by making sure the light inside the device was on. Sturm then placed the device on another of Bell's fingers, but still did not receive a reading. Sturm looked at Bell's appearance for evidence of a problem, but she noticed only that Bell was "a black girl." When Sturm was still unable to get a reading on the pulse oximeter, she summoned the nurse, Dolly Barnett.

Barnett looked at Bell and saw that she was pale. She performed a jaw thrust to open Bell's airway and saw that Bell was not breathing.

Barnett listened and felt for a heartbeat and breathing, but neither was present. Barnett told Sturm to bring CRNA Goode, and Barnett began administering cardio pulmonary resuscitation (CPR). Sturm went into the second operating room and told CRNA Goode that he was needed in the recovery room immediately.

Upon entering the recovery room, CRNA Goode began assisting Barnett with CPR. CRNA Goode picked up the Ambu bag, a portable mechanical ventilator attached to a tube of pure oxygen, placed it over Bell's nose and mouth, and squeezed the bag to force air into her lungs. The bag compressed smoothly, and CRNA Goode saw Bell's chest rising, which indicated that the oxygen was going into her lungs. Barnett continued administering chest compressions, while CRNA Goode ventilated Bell with the Ambu bag.

At approximately 8 a.m., after finishing another patient's procedure, Dr. Lichtenberg came into the recovery room. Dr. Lichtenberg took over the external chest compressions and continued them for the duration of the resuscitation effort. CRNA Goode attached electrocardiogram (EKG) cables to Bell and attached her to the EKG machine to monitor her cardiac activity. The EKG readout displayed a terminal pattern. At approximately 8:15 a.m., CRNA Goode intubated Bell with an endotracheal tube.

Dr. Lichtenberg diagnosed Bell's condition in the recovery room as electromechanical disassociation (EMD), in which there is electrical activity in the heart but it is disassociated or dispersed and is not causing the heart to pump. In light of that diagnosis, Bell was given epinephrine, first intravenously and then half through the endotracheal tube and half intravenously, at approximately 8:15, 8:25, 8:30, 8:40, 8:45, and 8:51 a.m. Because Dr. Lichtenberg believed Bell might have had an underlying ventricular tachycardia or fibrillation, electric shocks were also administered to Bell at approximately 8:25, 8:40, 8:45, and 8:51 a.m., using between 200 and 300 joules, a considerable amount for a patient of Bell's size. Bell showed no signs of response to these resuscitative measures. After approximately an hour of resuscitative attempts, Bell was pronounced dead at 8:52 a.m.

The Cook County medical examiner's office performed an autopsy on Bell, which showed that she did not have any underlying health problems. Because defendants had already suggested that Bell's death was the result of a condition known as amniotic fluid embolism (AFE), the medical examiner referred the autopsy results to a consulting pathologist specifically to assess any evidence of AFE. The consulting pathologist found no evidence of AFE. The medical examiner listed the cause of death on Bell's death certificate as "undetermined" and the manner of death as "expired after abortion."

Plaintiff filed a complaint, naming as defendants Family Planning Management, Inc., FPA-Chicago, Dr. Allred, Dr. Lichtenberg, CRNA Goode, K. McLean, Anne Hohmerer, and Jane Doe. Plaintiff sued as the personal representative and independent administrator of the estate of Deanna Bell, her daughter. Plaintiff's 60-count complaint sought recovery under theories of medical malpractice, the Survival Act (755 ILCS 5/27—6 (West 1996)), the Wrongful Death Act (740 ILCS 180/0.01 *et seq.* (West 1996)), *res ipsa loquitur*, failure to give informed consent, negligent hiring, and negligent supervision.

Defendants moved for summary judgment as to plaintiff's negligent hiring claims and all claims against Anne Hohmeier, Kathy McLean, and Family Planning Management, Inc. The circuit court entered an agreed order granting those motions. Plaintiff then moved to add FPA-California as a defendant. Over defendants' objections, the circuit court granted plaintiff's motion. Plaintiff then filed a second amendment to her complaint, and defendants filed an answer thereto. The case was tried before a jury beginning on April 28, 1998.

Plaintiff presented three medical experts at trial. Dr. Stuart Graham primarily rebutted defendants' theory of causation, and Dr. Craig Leicht and Dr. Steven Gordon addressed plaintiff's case in chief.

Plaintiff's experts testified that Bell's death was caused by numerous breaches of the standard of care by defendants. First, plaintiff's experts testified that the Physicians Desk Reference (PDR) specifications for Brevital reflect the standard of care regarding dosages. Plaintiff's experts testified that defendants breached the standard of care by administering three to four times the appropriate induction dose and five to six times the appropriate maintenance doses of Brevital. They testified that the consequences of such an overdose would be cessation of respiration and the inability of the body to signal its difficulty in breathing.

Second, plaintiff's experts testified that defendants failed to monitor Bell adequately. They testified that Bell should have been given supplemental oxygen by mask and should have been attached to an EKG machine both during the procedure and immediately upon her arrival in the recovery room. They stated that CRNA Goode should have checked Bell's vital signs upon arrival in the recovery room, verbally reported Bell's condition to a recovery room nurse, and obtained the nurse's affirmative acceptance of Bell's care before leaving the room. Plaintiff's experts further testified that there should have been at least two registered nurses in the recovery room and that Bell should not have been left in the hands of a medical assistant whose only medical training was on the job. As a result of defendants' failure to monitor Bell, plaintiff's experts stated, Bell's respiratory arrest went undetected until it was too late to resuscitate her.

Third, plaintiff's experts testified that defendants' resuscitation efforts fell below the standard of care and even below the standard set by defendants' own policies and procedures. The experts testified that defendants should have had Bell attached to an EKG before any problem was detected. Further, they stated that Dr. Lichtenberg, CRNA Goode, and Barnett should have been current in advanced cardiac life support (ACLS) protocols, there should have been at least two registered nurses trained in ACLS protocols in the recovery room to assist with resuscitation, and defendants should have called 911 for assistance from paramedics who were ACLS certified. Furthermore, the experts testified that resuscitation efforts made by defendants should have been made more quickly and with greater frequency in order for Bell to have had any chance of recovering from her arrest.

Finally, Dr. Leicht testified that defendants breached the standard of care by failing to inform Bell or plaintiff of the risk of death from general anesthesia.

At the close of plaintiff's case, defendants moved for a directed verdict on plaintiff's claims under the Survival Act and moved to strike the testimony of economist Christopher Curran in support of those claims. Plaintiff did not oppose defendants' motions, and the trial court granted them. Defendants also sought a directed verdict as to all remaining claims, or alternatively those against defendants Dr. Allred and FPA-California, all of which the trial court denied.

Defendants presented three expert witnesses in order to rebut plaintiff's claims of negligence and to present evidence that Bell's death was caused by AFE.

Dr. Steven Clark testified that one of the principal subjects of his research has been AFE. Dr. Clark testified that AFE is a rare condition, but that it is a leading cause of death from pregnancy-related complications. Dr. Clark explained that when a pregnancy is terminated, the barrier that has existed between the mother and fetus is disrupted and some fetal tissue or amniotic fluid may enter the mother's circulation. In a woman with AFE, according to Dr. Clark, exposure to fetal antigens causes the blood vessels in the lungs to stop picking up oxygen and has a direct depressive effect on the heart and its ability to function and pump blood.

In 1988, Dr. Clark and five other authors established a registry of AFE cases throughout the United States. They sought out and collected charts of AFE cases and possible cases throughout the country. Ultimately, they obtained 46 cases of AFE. However, 75% of the cases in Dr. Clark's registry were not AFE cases that had been reported by other doctors, but were cases involving malpractice litigation in which Dr. Clark had testified for the defendants and opined that the cause of death or injury was AFE and not the defendant doctors' negligence.

Dr. Clark testified that he believed that Bell's death was caused by AFE because she exhibited the symptoms that were noted in his 1995 article based on the AFE registry. Dr. Clark testified that it was impossible for Bell's oxygen saturation to go from 97% in the operating room to complete cardiopulmonary arrest by simply ceasing breathing. Dr. Clark stated that the only other explanations besides AFE that would be consistent with the time frame were a myocardial infarction or a pulmonary thromboembolism, but the autopsy results excluded both. Finally, Dr. Clark testified that no resuscitative therapy could have saved Bell because AFE is generally a lethal condition.

Dr. Patricia Perry was an anesthesiologist, with a subspecialty in obstetric anesthesia. She was certified in ACLS. Dr. Perry testified that the dosage of Brevital administered by CRNA Goode met the standard of care because an anesthetist must adjust the amount of anesthetic according to the patient's needs. Dr. Perry did state, however, that it was a larger dose of Brevital than she had ever given to anyone in her career. Dr. Perry also opined that the transfer of Bell from the operating room to the recovery room met the standard of care, as did the fact that CRNA Goode did not make an oral report to the recovery room nurse when he left Bell in her care. Further, Dr. Perry opined that the resuscitative measures taken by defendants met the standard of care, although she admitted that some of the steps were done more slowly than she would have liked.

Dr. Perry testified that Brevital was not the cause of Bell's death. She based her opinion on the fact that Bell had tolerated the same dosage of Brevital the day before in a slightly longer procedure and that Bell was stable in the operating room. Dr. Perry stated that she would not expect a patient to go from 97% oxygen saturation to cardiac arrest in a matter of one or two minutes. Dr. Perry opined that Bell's death was consistent with the kind of event that AFE can cause.

Finally, Dr. Perry stated that the consent forms in this case met the standard of care. She explained that the standard of care required informing patients of reasonably possible problems, but not every possible problem.

The final expert brought by defendants was Dr. Marilyn Frederiksen. Dr. Frederiksen considered herself an expert on the subject of second-trimester abortions, and she performed them as part of her routine medical practice.

Dr. Frederiksen testified that the consent form given to Bell conformed to the standard of care. She also opined that Bell's transportation to and care within the recovery room conformed to the standard of care. She stated that the staffing of the recovery room was proper and that 911 should not have been called because the patient

was never stabilized. Dr. Frederiksen found that Bell had AFE, which she supported by pointing to the fact that Bell presented with a cardiopulmonary arrest and that there was a post-mortem finding of congestion in Bell's lungs.

At the jury instruction conference, the trial court dismissed plaintiff's *res ipsa loquitur* claim. Plaintiff had proposed a *res ipsa* jury instruction that conformed to IPI Civil 3d Nos. 22.02 *(Res Ipsa Loquitur* and Specific Negligence as Alternative Theories of Recovery) and 105.09 *(Res Ipsa Loquitur*—Burden of Proof—Professional Negligence). Illinois Pattern Jury Instructions, Civil, Nos. 22.02, 105.09 (3d ed. 1995) (hereinafter IPI Civil 3d). Defendants argued that this was not properly a *res ipsa* case and that they would move to dismiss the *res ipsa* claim at the close of all the evidence. In the alternative, defendants proposed a different *res ipsa* instruction. The trial judge then asked for a case on *res ipsa* and plaintiff tendered a copy of *Gatlin v. Ruder,* 137 Ill. 2d 284, 560 N.E.2d 586 (1990). Having briefly reviewed that decision, the trial court judge stated, "There is not going to be any *res ipsa loquitur* here." After this statement by the court, defendants withdrew their proposed alternative jury instruction regarding *res ipsa.* Plaintiff sought reconsideration of the trial court's *res ipsa* ruling both immediately and at the end of the day. The trial court denied reconsideration on both occasions with no further explanation of the grounds for refusing the instruction and dismissing the claim.

At the end of the trial, the jury returned a verdict in favor of the defendants and the trial court entered judgment thereon. Plaintiff filed a motion for a new trial, and defendants filed a response. The trial court denied plaintiff's motion for a new trial, and plaintiff filed a timely notice of appeal.

On appeal, plaintiff first asserts that the trial court erred in refusing to instruct the jury regarding the *res ipsa loquitur* doctrine and in dismissing those counts of the complaint. Plaintiff contends that the court's actions deprived her of a fair trial and a new trial should be granted. We agree.

Before reaching the merits of plaintiff's appeal on this issue, we address defendants' argument that plaintiff has waived the issue by failing to specify in her posttrial motion why she believed the trial court's ruling was in error.

■ The relevant portion of section 2—1202(b) of the Illinois Code of Civil Procedure reads as follows:

> "The post-trial motion must contain the points relied upon, particularly specifying the grounds in support thereof, and must state the relief desired, as for example, the entry of a judgment, the

granting of a new trial or other appropriate relief." 735 ILCS 5/2—
1202(b) (West 1994).

Failure to so plead waives the issue for purposes of appeal under Il-
linois Supreme Court Rule 366(b)(2)(iii). 134 Ill. 2d R. 366(b)(2)(iii).

■ We find that plaintiff's posttrial motion on this issue fully
complied with section 2—1202(b) by "particularly specifying the
grounds in support" of plaintiff's argument that the trial court erred
in dismissing the *res ipsa loquitur* claim. In her posttrial motion,
plaintiff identified the issue with specificity by stating that "[t]he
Court erred as a matter of law in sua sponte dismissing plaintiff's res
ipsa loquitor [*sic*] claim." Plaintiff stated in her posttrial motion that
there was no specific motion to dismiss the claim at trial, that
defendants had not objected to the giving of an instruction to the jury,
and that the court's dismissal of the issue was *sua sponte.* Finally,
plaintiff cited two cases, identifying both as "reversing directed
verdict[s] for defendant[s] on res ipsa claim[s] in medical malpractice
case[s]."

■ The trial court has considerable discretion in determining
which issues have been raised by the trial evidence and the form in
which a jury instruction shall be given. *Hajian v. Holy Family Hospital*,
273 Ill. App. 3d 932, 937, 652 N.E.2d 1132 (1995). The refusal to give
an instruction will result in a new trial only where the party shows
serious prejudice to her right to a fair trial. *Hajian*, 273 Ill. App. 3d at
937. The propriety of an instruction depends on whether the instruc-
tions, considered as a whole, were sufficiently clear to avoid mislead-
ing the jury while at the same time fairly and correctly stated the law.
*Hajian*, 273 Ill. App. 3d at 937.

■ The *res ipsa loquitur* doctrine is a species of circumstantial evi-
dence permitting the trier of fact to draw an inference of negligence if
the plaintiff demonstrates that she was injured (1) in an occurrence
that ordinarily does not happen in the absence of negligence, and (2)
by an agency or instrumentality within the defendant's exclusive
control. *Gatlin v. Ruder*, 137 Ill. 2d 284, 295, 560 N.E.2d 586 (1990).
Illinois recognizes this doctrine and its applicability to medical mal-
practice actions. *Spidle v. Steward*, 79 Ill. 2d 1, 6, 402 N.E.2d 216
(1980).

In *Gatlin*, the Illinois Supreme Court comprehensively described
the general principles governing the application of *res ipsa loquitur* to
medical malpractice cases:

> " 'When a thing which caused the injury is shown to be under
> the control or management of the party charged with negligence
> and the occurrence is such as in the ordinary course of things
> would not have happened if the person so charged had used proper

care, the accident itself affords reasonable evidence, in the absence of an explanation by the party charged, that it arose from want of proper care. [Citations.] This in essence is the doctrine of *res ipsa loquitur*, and its purpose is to allow proof of negligence by circumstantial evidence when the direct evidence concerning cause of injury is primarily within the knowledge and control of the defendant. [Citation.] Like any other proof it may be explained or rebutted by the opposing party. \*\*\* [T]he inference, or presumption, [of negligence] does not simply vanish or disappear when contrary evidence appears, but remains to be considered with all the other evidence in the case and must be weighed by the jury against the direct evidence offered by the party charged. \*\*\*

Whether the doctrine applies in a given case is a question of law which must be decided by the court, but once this has been answered in the affirmative, it is for the trier of fact to weigh the evidence and determine whether the circumstantial evidence of negligence has been overcome by defendant's proof.' " *Gatlin*, 137 Ill. 2d at 294-95, quoting *Metz v. Central Illinois Electric & Gas Co.*, 32 Ill. 2d 446, 448-50, 207 N.E.2d 305 (1965).

■ As the Illinois Supreme Court indicated in *Gatlin*, when a plaintiff relies on the doctrine of *res ipsa loquitur*, the trial court must determine whether the doctrine applies as a matter of law. *Gatlin*, 137 Ill. 2d at 295. Section 2—1113 of the Illinois Code of Civil Procedure further provides:

"In all cases of alleged medical or dental malpractice, where the plaintiff relies upon the doctrine of res ipsa loquitur, the court shall determine whether that doctrine applies. In making that determination, the court shall rely upon either the common knowledge of laymen, if it determines that to be adequate, or upon expert medical testimony, that the medical result complained of would not have ordinarily occurred in the absence of negligence on the part of the defendant. Proof of an unusual, unexpected or untoward medical result which ordinarily does not occur in the absence of negligence will suffice in the application of the doctrine." 735 ILCS 5/2—1113 (West 1994).

■ In order to show the first element of *res ipsa loquitur*, an occurrence that ordinarily does not happen in the absence of negligence, a plaintiff is not required to show that the injury in question never happens without negligence, only that it does not ordinarily happen without negligence. *Spidle*, 79 Ill. 2d at 9. A plaintiff need only present evidence reasonably showing facts exist that allow an inference that the occurrence is one that ordinarily does not occur in the absence of negligence. *Perry v. Murtagh*, 278 Ill. App. 3d 230, 236, 662 N.E.2d 587 (1996). Such an inference cannot be based solely upon the fact of

a rare and unusual result, but such evidence must be coupled with proof of a negligent act. *Perry*, 278 Ill. App. 3d at 236.

If the defendant controverts the plaintiff's evidence that the injury ordinarily does not happen in the absence of negligence, that dispute does not provide grounds for taking the issue away from the jury. Factual disputes presenting credibility questions or requiring evidence to be weighed should not be decided by the trial judge as a matter of law. *Spidle*, 79 Ill. 2d at 10. Factual disputes should be resolved by the jury, " 'for it is here that assessment of the credibility of witnesses may well prove decisive.' " *Spidle*, 79 Ill. 2d at 10, quoting *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 504 (1967).

In addition, a plaintiff does not forfeit her reliance on the *res ipsa loquitur* doctrine by presenting evidence regarding the specific nature of the defendant's negligence or the cause of the injury. As the Illinois Supreme Court stated in *Kolakowski v. Voris*:

> "The inference of negligence raised by the doctrine of *res ipsa loquitur* does not disappear when such specific evidence is admitted. Rather, both the opinion of the expert witness as well as the inference of general negligence arising from the doctrine of *res ipsa loquitur* remain to be considered by the jury with all other evidence in the case. [Citation.] Our appellate court has consistently permitted a plaintiff to introduce evidence of specific negligence without depriving him of his right to rely on the doctrine of *res ipsa loquitur* where such specific evidence does not conclusively establish the cause of the injury." *Kolakowski v. Voris*, 83 Ill. 2d 388, 397, 415 N.E.2d 397 (1980).

In the present case, plaintiff presented sufficient evidence to allow the *res ipsa loquitur* doctrine to be considered by the jury, both in the form of direct evidence that the injury would not ordinarily have happened in the absence of negligence and in the form of evidence of specific negligence. Also, it is not disputed that defendants had exclusive control of the instrumentality as the patient was unconscious.

In the present case, the direct evidence that the injury would not ordinarily have happened in the absence of negligence consisted of plaintiff's expert testimony. Dr. Gordon and Dr. Leicht were asked whether Bell's death would ordinarily have happened in the absence of negligence, and both testified unequivocally that it would not. Dr. Gordon testified that he did "not believe [Bell's death] would have happened in the absence of negligence." Dr. Leicht also testified that Bell "would not—should not have died in the absence of negligence in this case."

In addition, plaintiff presented evidence of specific negligence by

defendants in the form of medical records, expert testimony, and other witness testimony. Plaintiff presented evidence that Bell was a healthy 13-year-old prior to the abortion procedure, with no hidden physical conditions that caused her death. She presented evidence that deaths associated with second-trimester abortions are very rare. Plaintiff also presented expert testimony stating that the dosages of anesthesia given to Bell were unusually high and that the monitoring of and resuscitation attempts on Bell did not meet the standard of care. Plaintiff, through expert testimony, also disputed defendants' claims that AFE was the cause of Bell's death.

Even the defendants' experts' testimony regarding AFE highlighted how incredibly rarely this condition occurs. Dr. Frederiksen compared contracting AFE to being hit by a lightning bolt. Dr. Clark and four other professionals could find only 46 alleged cases of AFE among the millions of births and abortions occurring during the time period of their study.

In short, plaintiff presented sufficient evidence to the trial court to raise a factual issue as to whether Bell's death would have occurred ordinarily, without negligence, and the *res ipsa loquitur* negligence counts should have been submitted to the jury for a decision. By refusing to give an instruction regarding the doctrine of *res ipsa loquitur* and dismissing those counts of the complaint, we find that the trial judge deprived the jury of the opportunity to decide these counts and deprived plaintiff of her right to a fair trial.

■ Plaintiff next argues that the trial court should have given an instruction that the jury could consider defendants' internal policies and procedures as evidence of the standard of care. Plaintiff argues that, by not giving this instruction, the trial court committed reversible error. We agree.

Defendants argue that this issue was not preserved for appellate review because the record does not include the tendered instruction to the trial court. However, the record clearly shows that plaintiff tendered such an instruction to the trial court, that defendants read portions of the instruction into the record and objected on the ground that the internal policies and procedures portion of the instruction was repetitious, and that the trial court changed the language of the instruction based upon defendants' argument. In her posttrial motion, plaintiff renewed her contention that the instruction should have been given and she raises that claim again on appeal. Accordingly, we find that this issue has been properly preserved for review. See *Poole v. University of Chicago*, 186 Ill. App. 3d 554, 560, 542 N.E.2d 746 (1989).

Plaintiff's proposed instruction No. 11 tracked IPI Civil 3d No. 105.03.01 (Duty of a Health Care Institution—Institutional Negli-

gence). In the second paragraph of proposed instruction No. 11, plaintiff proposed the following language:

"In deciding whether FPA-Chicago or FPA-California exercised ordinary care, you may consider expert testimony, evidence of professional standards, evidence of by-laws, and evidence of internal policies and procedures presented in this case."

Defendants objected to the proffered instruction as repetitious. The trial court stated that it would replace the references to bylaws and internal policies and procedures in the instruction with "evidence of community practice, and other evidence of appropriate standards presented in this case." Plaintiff pointed out that evidence of internal policies and procedures had been presented during the trial. The trial court then stated, "I'm well aware of that. That's not going in. Redraw it."

When considering the standard of care to which a clinic should be held, the clinic's internal policies and procedures are an appropriate source of evidence, and the failure of a clinic to follow its policies can be evidence of a breach of the clinic's duty to a patient. See *Darling v. Charleston Community Memorial Hospital*, 33 Ill. 2d 326, 332, 211 N.E.2d 253 (1965) (evidence of hospital regulations, standards, and bylaws aids the jury in deciding what was feasible and what the defendant knew or should have known). When a case involves a medical institution rather than a single medical practitioner, it is appropriate that a broad range of evidence be available to establish the applicable standard of care. *Greenberg v. Michael Reese Hospital*, 83 Ill. 2d 282, 293, 415 N.E.2d 390 (1980). The comment to IPI Civil 3d No. 105.03.01 also specifically states that "[w]hether or not the defendant has conformed to this standard of care may be proved by a wide variety of evidence, including, but not limited to, expert testimony, hospital by-laws, statutes, accreditation standards, customs, and community practice." IPI Civil 3d No. 105.03.01, Comment, at 297.

In this case, plaintiff presented evidence that defendants repeatedly violated their own policies and procedures in their recovery room resuscitation attempt on Bell. Specifically, plaintiff presented evidence that defendants delayed epinephrine administration and intubation, administered insufficient doses of epinephrine, delayed electric shocks and administered shocks of inadequate intensity and frequency, and failed to call for emergency assistance, all contrary to defendants' written policies.

Having received evidence of defendants' policies and procedures and testimony by defendants' witnesses and plaintiff's experts that defendants did not abide by those policies and procedures, the jury should have been instructed explicitly that it could consider defen-

dants' policies and procedures in determining whether defendants complied with the standard of care. Instructing the jury to consider "other evidence of appropriate standards presented in this case" did not sufficiently point the jury to the relevant evidence. Thus, we find that the trial court's refusal of plaintiff's proposed instruction was prejudicial error and we reverse.

■ Plaintiff also claims on appeal that the trial court erred both by refusing to allow her to present evidence that Bell's vital signs were precharted in the recovery room and by refusing to allow plaintiff to publish that recovery room record to the jury. We agree.

Defendants argue that plaintiff's claim was waived because she did not provide this court with a record that supports her claim of error. However, the trial transcript provided to this court records the discussion between the attorneys and the trial judge regarding the suppression of the evidence at issue. The trial transcript describes the evidence that plaintiff intended to present, defendants' objections to that evidence, plaintiff's arguments that the evidence was relevant and admissible, and the court's reasons for granting defendants' motion to suppress. Accordingly, we find that the record on appeal is sufficient for this court to review plaintiff's claim of error.

In *Karsten v. McCray*, 157 Ill. App. 3d 1, 10-11, 509 N.E.2d 1376 (1987), the plaintiffs (Mr. and Mrs. Karsten) appealed the circuit court's refusal to hear evidence of a conversation between Mr. Karsten and one of the defendants (Dr. Asselmeier), where Mr. Karsten insisted that Mrs. Karsten be hospitalized against Dr. Asselmeier's recommendation. This court reversed and held that the conversation was admissible because it went directly to Dr. Asselmeier's failure to recognize the seriousness of Mrs. Karsten's condition and was relevant to the issue of Dr. Asselmeier's negligence.

Similarly, we believe the evidence of precharting in this case is relevant to plaintiff's negligence action against defendants. When Bell arrived in the recovery room, an untrained "medical assistant" precharted Bell's expected vital signs without checking Bell's actual vital signs. There was testimony at trial that at or around the time that Sturm was precharting Bell's vital signs, Bell was suffering from respiratory arrest. It is certainly important that the trier of fact be informed that precharting took place and that it see the precharted portions of the recovery room record in order to determine approximately how long Sturm spent precharting before actually tending to Bell. This evidence indicates defendants' disregard for Bell's postoperative recovery, which is relevant to the issue of defendants' negligence. We determine that the trial court's refusal to permit the jury to consider this evidence deprived plaintiff of a fair trial.

For the foregoing reasons, we reverse the order of the circuit court denying plaintiff's motion for a new trial and remand the cause to the circuit court for a new trial in accordance with this opinion.

We now address the other issues raised by plaintiff on appeal because the issues are likely to recur on retrial.

■■ First, plaintiff argues that her experts' opinions, that the research on which defendants' expert, Dr. Clark, based his opinion was scientifically invalid and biased, was admissible expert testimony. We agree.

In the briefs on appeal, much was made of whether plaintiff's supplemental response to defendants' Rule 213 (134 Ill. 2d R. 213) interrogatory, given at trial, gave defendants sufficient notice to permit plaintiff's experts to testify regarding their new opinions. However, since we have remanded this cause to the trial court on other grounds and this Rule 213 issue is not likely to recur, we reach only the admissibility of plaintiff's experts' testimony generally.

An expert may give an opinion without disclosing the facts underlying such an opinion. *Wilson v. Clark*, 84 Ill. 2d 186, 194, 417 N.E.2d 1322 (1981). It is, then, the opponent's responsibility to challenge the sufficiency or reliability of the basis for the expert's opinion during cross-examination, and the determination of the weight to be given the expert's opinion is left to the finder of fact. *People v. Lipscomb*, 215 Ill. App. 3d 413, 435, 574 N.E.2d 1345 (1991). The adverse party may also have its own expert witness testify as to the validity and reliability of the methodology underlying the opposing expert's opinion. See *Cox v. Doctor's Associates, Inc.*, 245 Ill. App. 3d 186, 211, 613 N.E.2d 1306 (1993) (defendant's expert testified that he could not say that plaintiff's expert's overall methodology was faulty and testified that he had used similar methods to calculate damages).

In the present case, plaintiff's experts, Dr. Leicht and Dr. Gordon, were to testify that Dr. Clark's "National Registry," the data upon which his findings were based, was scientifically unsound and biased. Plaintiff stated that her experts would have testified that Dr. Clark violated accepted clinical research standards by disposing of his data too quickly and by suspending the registry with so little data. Plaintiff's experts were to further testify that because approximately 75% of the medical cases included in the registry were in litigation and Dr. Clark was serving as an expert witness for the defense in those cases, there was a biased relationship between the researcher and the medical cases and thus the sample was biased. However, the trial court did not allow plaintiff's experts to testify on this issue; instead, the court instructed plaintiff to limit criticisms of Dr. Clark's methodology to his cross-examination.

We find that plaintiff has the burden to challenge the reliability of the methodology underlying Dr. Clark's opinion. As a result, plaintiff may cross-examine Dr. Clark regarding his methodology. Plaintiff may also call experts to testify that Dr. Clark's methodology was unscientific and invalid, if plaintiff complies with the strict discovery requirements laid out in Supreme Court Rule 213. The weight to be given the experts' opinions must then be determined by the jury.

Plaintiff next argues that the trial court erred in refusing to allow impeachment of defendant Goode by discovery deposition. We find that defendant Goode's deposition testimony is admissible under Supreme Court Rule 212(a). 134 Ill. 2d R. 212(a).

Supreme Court Rule 212(a) limits the purposes for which discovery depositions may be used at trial. Rule 212(a) states that discovery depositions may be used:

"(1) for the purpose of impeaching the testimony of the deponent as a witness in the same manner and to the same extent as any inconsistent statement made by a witness;

(2) as an admission made by a party or by an officer or agent of a party in the same manner and to the same extent as any other admission made by that person;

(3) if otherwise admissible as an exception to the hearsay rule; or

(4) for any purpose for which an affidavit may be used." 134 Ill. 2d R. 212(a).

Different evidentiary rules apply to the use of deposition testimony depending on whether the deponent is a party to the case. *In re Estate of Rennick*, 181 Ill. 2d 395, 408, 692 N.E.2d 1150 (1998). The evidentiary rules that limit the use of a nonparty witness' deposition testimony simply do not apply to a party deponent. *Rennick*, 181 Ill. 2d at 408. However, even the deposition of a nonparty witness is generally admissible for impeachment purposes under Rule 212(a)(1). *Rennick*, 181 Ill. 2d at 408. In addition, the deposition testimony of a party may contain admissions which are an exception to the rule excluding hearsay, and are admissible under Rule 212(a)(2). *Rennick*, 181 Ill. 2d at 408. Statements of a party made during a deposition are also admissible as an exception to the rule excluding hearsay when introduced by a party opponent, under Rule 212(a)(3). *Rennick*, 181 Ill. 2d at 408.

Thus, we find that defendant Goode's deposition testimony is admissible under Supreme Court Rule 212(a).

Finally, plaintiff argues that the trial court erred in excluding evidence relating to defendants' "assembly line" approach to general anesthesia abortion procedures. This evidence consisted of the number of such procedures scheduled for September 5, 1992, and a newspaper

article from 1980 in which defendant Allred admitted to having an "assembly line" approach to these procedures. Since the trial court is in a better position to determine the relevance and admissibility of such evidence, we leave this issue to be determined by the trial court on remand.

For the foregoing reasons, we reverse the order of the circuit court denying plaintiff's motion for a new trial and remand the cause to the circuit court for a new trial in accordance with this opinion.

Reversed and remanded with directions.

HARTMAN and GREIMAN, JJ., concur.