THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. THE ALMIGHTY FOUR HUNDRED, Defendant-Appellant.

First District (3rd Division)    No. 1—95—4264

Opinion filed March 5, 1997.

Rita A. Fry, Public Defender, of Chicago (Timothy J. Leeming, Assistant Public Defender, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, William D. Carroll, and Celeste Stewart Stack, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE COUSINS delivered the opinion of the court:

Following a bench trial, defendant, The Almighty Four Hundred, was found guilty of first-degree murder and concealment of a homicidal death. The trial court sentenced defendant to 70 years' imprisonment. On appeal, defendant argues that: (1) the prosecution failed to prove him guilty beyond a reasonable doubt; (2) the trial court erroneously admitted statistical probability testimony; and (3) the defendant's right to confront and examine witnesses against him was violated when the prosecution introduced hearsay by a nontestifying witness involving the statistical probability of a DNA match.

BACKGROUND

On the morning of February 28, 1994, the body of 16-year-old Lakeisha McAllister was found in a garbage dumpster in an alley adjacent to the Grand Ashland Hotel in Chicago. She had been strangled and her throat had been slashed. At trial, the following evidence was elicited.

Salvator Martorina testified that he owns the building located at 466 Ashland. The building contains shops on the first floor and apartments on the upper floors, which are known as the "Grand Ashland Hotel." Martorina had employed defendant for about six months

prior to the murder as the building security manager. Defendant lived on the third floor of the building. Martorina testified that he knew the victim and had seen her at the hotel for two to three months previous to the murder.

The hotel office was on the second floor of the building. Adjacent to the office was a kitchen and bathroom. From the street, there was a flight of stairs to the second floor. The door to the second-floor hotel entrance had a security buzzer lock, but the door was often propped open by tenants. The hotel rooms do not have bathrooms but share a common bathroom in the hall. The office was not cleaned regularly. When Martorina saw the office on Sunday, February 27, it was dirty and cluttered with debris. When he returned the next day, the office looked and smelled clean and the furniture was rearranged. Martorina, defendant and a woman who had been employed at the hotel, but who had not been seen in one to two months, possessed keys to the office area.

Other testimony revealed that on the night that she was murdered, the victim called her foster mother, Earnestine Bynum, sometime between 10:30 p.m. and midnight, to tell her that she would be returning to the Bynum household. Bynum did not notice anything unusual about the victim's voice. Forty-five minutes to an hour after the victim's call, defendant called Bynum to see if the victim had arrived there. The victim did not arrive that night.

At 10:50 a.m. on February, 28, 1994, police officer William Smith received a call about a body found in a garbage dumpster at 1626 West Ferdinand Street, which is approximately 200 feet south of Grand Avenue and 90 yards away from the hotel. At the scene, the officer observed the victim's body in the dumpster and noted that she had blood on her head, face and upper body clothing.

At 11:20 a.m. on February 28, 1994, John Redmond, a Chicago police department evidence technician, arrived at the alley crime scene. He observed the victim's body in the garbage dumpster and blood in the snow. He and other officers then walked to the hotel. Defendant invited the officers into his apartment after meeting them in the alley. The officers noticed a stain on defendant's pants and took the pants to the police crime lab.

On March 2, 1994, Officer Alfred Perez examined the hotel's office after noting the smell of cleaning solution. Perez noted that the office had a single entrance with two locks on the door. He called the crime lab technicians after he saw what he suspected were bloodstains on the oven in the kitchen area.

On March 2, 1994, Officer Gregory Janicki examined the kitchen area of the hotel and recovered blood samples from various locations in the kitchen.

Cora Pittman testified that she lived in the hotel, in room 212, down the hall from defendant's room. Pittman testified that she knew the victim and knew that the victim lived with defendant in room 210. At about 10 or 10:30 p.m., on February 27, 1994, Pittman walked down the hall to use the common bathroom. As she passed defendant's room, she heard the victim screaming and yelling. She heard the victim scream "get off me" and saw that the door to defendant's apartment was slightly open. Pittman could see inside the apartment and saw the victim on the floor with defendant on top, punching her. Pittman testified that she heard the victim say: "Get off me, I'm going to tell everything." Defendant said, "I'm going to kill you, if you don't shut up bitch." Pittman went back to her room but heard more noise coming from defendant's room. After hearing tumbling and screaming for about 20 to 25 minutes, Pittman looked into the hall and saw the victim run into the hallway towards the door leading to the back stairwell. Defendant chased the victim, grabbed her and dragged her by her hair back to his apartment. Pittman then heard more "tumbling" noises and screaming coming from defendant's room.

Around 4 a.m., defendant knocked on Pittman's door and asked for her eldest son. He had never done this before. Pittman told defendant that her son was asleep. Pittman testified that defendant was wearing black pants and no shirt and had a towel around his neck. His body was soaking wet. Pittman identified the pants she saw defendant wearing that night. Defendant left her door but came back four more times.

Joe Brooks testified that he knew the victim. On February 27, 1994, Brooks received a telephone call from the victim at about 10:30 p.m. or 10:45 p.m. The victim was crying. Although Brooks told the victim that he would pick her up at the hotel at 11:15 p.m., he did not.

Elizabeth Taylor testified that she is a friend of Lakeisha McAllister and her twin sister. She and another woman, Olivia Brown, went to the hotel in the evening on February 27, 1994, at approximately 1 a.m. When they entered the hotel, they saw the defendant in the office. Defendant was standing there wearing black sweat pants, no shirt, and a black jacket, which was open. Taylor and Brown spoke to defendant, who stated that he did not know where the victim was. Taylor and Brown went upstairs but they did not find the victim. Taylor testified that she did not notice anything unusual in the 10 to 15 minutes that she was at the hotel that night.

Ayanna Montgomery testified that she became a friend of the victim because her sister lived in room 204 of the Grand Ashland

Hotel. Montgomery would spend weekends at the hotel with her sister. Room 204 was located directly above the hotel office. Room 210, where defendant and the victim resided, was down the hall from room 204. Montgomery testified that she spent the night of February 27, 1994, at the hotel. She was awakened in the middle of the night by screams that sounded nearby. The screams were those of a female shouting, "Stop, leave me alone, get your fucking hands off me." Montgomery did not look at a clock but guessed, by looking at the position of the moon, that the screams occurred at 3 a.m. Montgomery also noted that the kitchen adjacent to the office of the hotel had been filthy the day before the murder but clean the day after the murder.

The State presented Therese Finn, a forensic biologist for the Chicago Police Department Crime Laboratory. Finn testified that blood taken from defendant's pants matched that of the victim. The likelihood of that blood coming from someone other than the victim is "less than one in a billion." Finn also testified that blood recovered from the jacket defendant was wearing on the night of the murder also matched that of the victim and the likelihood of such a match is "less than one in a billion." Finn also testified that blood taken from the kitchen area of the hotel office matched the victim's blood. The probability of such a match is "less than one in a billion."

Defendant's expert, Sandy Zabell, a professor of mathematics and statistics, testified that, according to his calculations, the frequency of seeing a match between the blood at the crime scene and the victim's blood was 1 in 3 to 4 million, or 1 in 1.2 million if the most conservative calculation was done.

The trial court found defendant guilty of first-degree murder and concealment of a homicidal death. After hearing evidence in aggravation and mitigation, the trial court sentenced defendant to 70 years in the Department of Corrections for first- degree murder.

We affirm.

## ANALYSIS

### I

We will first address defendant's second issue. Defendant argues that it was error for the court to admit statistical probability testimony, where no single method has been generally accepted within the scientific community. The State contends that the trial court properly admitted Finn's testimony and that evidence concerning alternate methods of computing statistics went to the weight to be given that evidence, not its admissibility.

At trial, the State tendered Therese Finn as an expert in forensic biology and forensic DNA analysis. Finn is a forensic biologist for the Chicago Police Department Crime Laboratory (CPD). She has a bachelor of science degree in biology from the University of Illinois. At the time of the trial in this case, she was working on her master of science degree in biotechnology at the Illinois Institute of Technology. Finn received training in forensic DNA at the Forensic Science Research and Training Center of the Federal Bureau of Investigation (FBI) and attended numerous workshops, seminars and meetings conducted by other forensic laboratories throughout the country. At the CPD, Finn was trained in serology, the analysis of blood and other bodily fluids such as semen and saliva. She was one of three analysts who established the DNA program at the CPD. Finn has conducted hundreds of DNA analyses. In addition, Finn testified that she has given numerous presentations and lectures to members of the legal and scientific communities on various aspects of DNA testing.

Finn testified that the chemical deoxyribonucleic acid (DNA) is the genetic material that is found in a person's cells which contains a "blueprint" of all genetic information necessary for life. Except in the case of identical twins, each person's DNA is totally unique. In the human body, DNA is present in every single cell that has a nucleus. Finn defined forensic DNA analysis as conducting DNA tests on blood samples and comparing the results with the DNA of known blood standards for the purpose of determining if an individual can be included or excluded as a possible contributor of the sample.

Finn explained that in forensic DNA analysis, DNA is first isolated from blood cells. Following a series of steps, a pattern of DNA bands is generated by which different DNA fragment lengths can be compared. This process is referred to as Restriction Fragment Length Polymorphism (RFLP) analysis. A DNA molecule is composed of 3 to 4 billion "base pairs" of four different chemicals. The particular pattern of these base pairs dictates an individual's genetic characteristics. RFLP profiling focuses on the areas of the DNA molecule where there is a significant variation between individuals of a base pair pattern. Finn explained that, in this case, DNA was isolated from the blood cells. The base pairs seen in the DNA in the blood collected at the crime scene were then compared visually and mathematically with base pairs in the DNA from blood taken from the victim and the defendant. In this case, DNA in blood found on defendant's clothes and in the hotel matched the DNA in the victim's blood.

In order to make the matches meaningful, statistical analysis is

required. After a match is determined visually and mathematically, analysts calculate the frequency or rarity of seeing a particular DNA pattern to the frequency of seeing this combination in the general population. To accomplish this, DNA analysts have generally used either the "product rule" or the "ceiling principle."

Finn testified that she performed DNA analysis on a large stain on the pants police recovered from defendant. The DNA in this blood was compared to the victim's blood. A match was determined visually and mathematically. The rarity of seeing this match in the population was then calculated using the "product rule." Finn testified that the likelihood of a randomly selected individual having the same DNA profile that was generated from the victim's blood was "less than one in a billion." In other words, the likelihood that the blood on defendant's pants came from someone other than the victim is less than one in a billion. A DNA profile was also generated from the blood found on the jacket that defendant was wearing on the night of the murder. The DNA profile of the blood on defendant's jacket also matched the victim's profile, and the likelihood of a randomly selected individual having the same DNA profile is "less than one in a billion." A DNA profile was also generated from the blood found in the kitchen. The DNA profiles from these three samples also matched the victim's DNA. Finn testified that the probability of this DNA profile being found in a randomly selected individual is "less than one in a billion." Finn testified that if the "ceiling principle" were used in calculating these statistics, the resulting frequency would be 1 in 3.4 million.

Defendant argues that a statistical probability estimate should not have been admitted because population genetic statisticians disagree as to whether the "product rule" or the "ceiling principle" should be used for calculating such probabilities.

■ The decision of whether to admit expert testimony about a new scientific technique is committed to the sound discretion of the trial court. *People v. Eyler*, 133 Ill. 2d 173, 212, 549 N.E.2d 268 (1989). Illinois follows the standard as delineated in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), for the admission of novel scientific evidence. *Frye* requires that the evidence be generally accepted in the relevant scientific community before it can be admitted. *Frye*, 293 F. at 1014; *People v. Thomas*, 137 Ill. 2d 500, 517, 561 N.E.2d 57 (1990).

Defendant relies on Illinois Appellate Court holdings in *Franson v. Micelli*, 269 Ill. App. 3d 20, 645 N.E.2d 404 (1994), *vacated*, 172 Ill. 2d 352, 666 N.E.2d 1188 (1996), and *People v. Watson*, 257 Ill. App. 3d 915, 629 N.E.2d 634 (1994). In both *Micelli* and *Watson*, the appellate court barred the introduction of probability statistics evidence and

held that the methodology by which statistical probabilities are derived has not been generally accepted in the relevant scientific community.

■ Our supreme court recently addressed the issue of whether the "product rule" is generally accepted in the scientific community in *People v. Miller*, 173 Ill. 2d 167, 670 N.E.2d 721 (1996). In *Miller*, the defendant argued that DNA evidence based on calculations using the "product rule" was erroneously admitted against him at his trial in light of *Watson*, 257 Ill. App. 3d 915, 629 N.E.2d 1188. *Miller*, 173 Ill. 2d at 183. The *Miller* court discussed and then dismissed the finding in *Watson* that the "product rule" should not be used in calculating the statistical probability of a match. 173 Ill. 2d at 188-90. The court noted that the controversy over the use of the method was present in 1991 when the court heard the *Watson* case, but now appeared to be dissipating. 173 Ill. 2d at 188. The court concluded that since the scientific and legal status of the "product rule" has continued to evolve and become accepted by experts and courts, the trial court did not abuse its discretion in allowing the DNA expert to testify regarding the expert's use of the "product rule" and its resulting statistics. *Miller*, 173 Ill. 2d at 189-90.

The *Miller* case is dispositive of this issue. The *Miller* court held that *Watson* is no longer controlling and that the use of the product rule is proper. Accordingly, we hold that, in the instant case, the trial court did not abuse its discretion in allowing Finn's testimony regarding the DNA evidence.

## II

Defendant also contends that his right to confront and examine witnesses against him was violated when the prosecution was allowed to introduce hearsay by a nontestifying witness, Dr. Michael Conneally.[1]

At trial, Finn testified that after two evidence samples are deemed to have matched, a statistical value is attached to the match to illustrate the rarity or frequency of seeing such a match. To do this, DNA samples are taken from a random population of individuals and the frequency of seeing certain patterns of DNA in the random population is determined. The random population is gathered into a database. Finn testified that in 1991, she and two other DNA analysts compiled the 600 DNA samples that are used for the CPD's population database. Since the "product rule" is based upon the presumption that the samples in the database are randomly gathered

---

[1]Although the expert was referred to throughout the record as Michael "Keneally," the correct spelling of his name is "Conneally."

and therefore independent of each other, it is necessary to validate that the samples in the database are independent and random. Finn testified that in order to validate the database, human population geneticists subject the database to tests known as equilibriums. After the CPD compiled its database, the database was given to Dr. Michael Conneally, who is a human medical geneticist. He performed the "Hardy-Weinberg" equilibrium test on the database to validate the independence of its data. At trial, the following colloquy took place:

"Q. The Chicago database that was compiled, was that then statistically reviewed or analyzed by human population geneticists?

A. Yes it was.

Q. Who analyzed or reviewed that data base?

A. Doctor Michael Keneally [sic] from Indiana University.

Q. And do you know who Dr. Keneally [sic] is, his background?

A. Yes.

Q. Would you please tell his honor.

MR. SINCOX [defendant's attorney]: I'm going to object. Clearly they're leading up to some kind of opinion from Dr. Keneally [sic]. Essentially that's hearsay. I see no reason to go into his qualifications if you are not going to get his opinion ultimately. I would object to that as being hearsay."

The court allowed Finn to continue and reserved the option to strike questions subject to the objection later on.

"Q. Who is Dr. Keneally [sic]?

A. Dr. Keneally [sic] is a human medical geneticist.

Q. And was he given the information, the statistical review and analyze [sic] the Chicago database?

A. Yes, he was given all the data from our data base.

\* \* \*

Q. Did the Chicago data base meet the Hardy-Weinberg equilibrium?"

Defense counsel objected that Conneally's opinion was hearsay. The court agreed that the testimony was hearsay but allowed Finn to testify as to Conneally's findings after concluding that the testimony constituted a business records exception to the hearsay rule. The court stated in pertinent part:

"[F]or whatever it's worth, I will allow the witness to testify to that this [sic] is a common practice for validating the process and the database. So I will allow her to testify to that under it being basically a business records. This is the way this type of procedure is followed in order to do this and that these are the common procedures that people do it and go through it. I'll allow it in as a

business practice more or less, and I will allow her to answer that question."

After a brief recess, the examination of Finn continued and she was allowed to testify that the database met the Hardy-Weinberg equilibrium test.

Before addressing the merits of defendant's contentions, we must first clarify a misstatement of fact made by defendant in his brief and at oral argument. Defendant argues that Finn should not have been allowed to testify to matters of statistical probability where the "sole basis of her calculations was the work of Keneally [sic]." Furthermore, at oral argument, defendant argued that Finn did not calculate the statistical probabilities herself. These assertions are incorrect. Our review of the record indicates that Finn did calculate the probabilities, herself, and merely relied on Conneally's conclusions as part of her analysis.

■ Defendant's arguments appear to be premised on a misunderstanding of Conneally's role in this case. Finn did repeat Conneally's conclusion that the CPD database met the Hardy-Weinberg equilibrium test. In our view, Finn's testimony was not hearsay. It was not offered for the truth of the matter asserted. See *Young Men's Christian Ass'n v. Midland Architects, Inc.*, 174 Ill. App. 3d 966, 971, 529 N.E.2d 288 (1988). Rather, Finn's testimony was properly admitted under Federal Rule of Evidence 703. Fed. R. Evid. 703.

This court adopted Rules 703 and 705 of the Federal Rules of Evidence in *Wilson v. Clark*, 84 Ill. 2d 186, 417 N.E.2d 1322 (1981), and held that an expert witness may base his or her opinion on information that has not been admitted into evidence so long as that information is reliable and is of a type reasonably relied upon by experts in that field. Rule 703 did not, however, create an exception to the hearsay rule (*City of Chicago v. Anthony*, 136 Ill. 2d 169, 185, 554 N.E.2d 1381 (1990)). The underlying facts or data upon which an expert in a particular field is found to have reasonably relied are not admitted for their truth. *City of Chicago*, 136 Ill. 2d at 185. Rather, these facts are admitted for the limited purpose of explaining the basis for the expert witness' opinion. *City of Chicago*, 136 Ill. 2d at 185, citing *People v. Anderson*, 113 Ill. 2d 1, 12, 495 N.E.2d 485 (1986). Furthermore, it is for the circuit court, in the exercise of its discretion, to determine whether the underlying facts or data upon which an expert bases an opinion are of a type reasonably relied upon by experts in the particular field. *City of Chicago*, 136 Ill. 2d at 186. Such a determination shall not be disturbed unless there has been an abuse of discretion. *City of Chicago*, 136 Ill. 2d at 186.

Defendant contends that in cases involving DNA probability

statistics such as *People v. Lipscomb*, 215 Ill. App. 3d 413, 574 N.E.2d 1345 (1991), and *People v. Contreras*, 246 Ill. App. 3d 502, 615 N.E.2d 1261 (1993), experts such as Conneally have always been required to testify. Defendant misapplies these cases. In *Lipscomb*, DNA testing was used to identify the defendant, who was charged with aggravated sexual assault. Several forensic scientists at Lifecodes, a corporation created to refine DNA testing, testified about the DNA analysis they performed on the blood samples. Dr. P. Michael Conneally testified and gave statistical probabilities of the frequency of DNA matchings that were completed by two other doctors. *Lipscomb*, 215 Ill. App. 3d at 423. Defendant contends that Conneally, who testified in *Lipscomb*, is probably the same Conneally in the instant case and that, therefore, since Conneally testified in *Lipscomb*, he should have testified in the instant case. We disagree. In fact, we believe that *Lipscomb* more aptly supports our analysis.

In *Lipscomb*, Conneally was one of several experts who reviewed matching DNA samples and offered probability statistics. Another expert, Dr. Baird, also matched DNA samples and gave an opinion as to the probability of the matchings appearing in the population. To reach his opinion, he relied on a final report that contained matchings or sizings performed by two other Lifecodes scientists, Melinda Keel and Kevin McElfresh. 215 Ill. App. 3d at 423. The defendant argued, as the defendant in this case similarly argues, that Dr. Baird should not have been allowed to give an opinion that was based on a final report that included McElfresh's sizings, because McElfresh did not testify. 215 Ill. App. 3d at 435. The appellate court disagreed with the defendant and found that the final report and the measurements in it were data of the type relied upon by experts in the field and, therefore, properly admitted under *Wilson*. 215 Ill. App. 3d at 435.

Defendant also misconstrues the facts in *Contreras*. In *Contreras*, DNA analysis was used to identify the defendant in a violent home invasion. The State presented Thomas Wahl, a forensic geneticist, as its DNA expert. The trial court recognized Wahl as an expert in the field of forensic genetics and serology. *Contreras*, 246 Ill. App. 3d at 508. Wahl detected a rare genetic variant in the defendant's DNA and in the evidence samples taken from the victim's home. He then used population statistics to determine the frequency with which the variant occurred in the male Mexican-American population, of which the defendant was a part. 246 Ill. App. 3d at 508. Wahl used a combination of population databases as the basis for his statistics. Wahl used one database from a study conducted at the Minneapolis Blood Center and published by the American Association of Blood Banks, and one database conducted in Starr County, Texas, and

published in the American Journal of Human Genetics. 246 Ill. App. 3d at 508. Contrary to defendant's assertion in the instant case, no other expert testified about any aspect of these population databases. Wahl stated that both studies used a reliable method for accumulating a database for generating statistical information. Wahl then applied the Hardy-Weinberg equilibrium test to these databases to determine the statistical probabilities of the frequencies of the defendant's rare variant.[2] 246 Ill. App. 3d at 508. The defendant challenged the basis for the statistics, in part, because Wahl had no independent knowledge of the procedures used by the authors of the studies upon which he relied. 246 Ill. App. 3d at 510-11. Relying on *People v. Lipscomb*, 215 Ill. App. 3d 413, 574 N.E.2d 1345, the court held that the testimony was properly admitted because the information from which Wahl generated his statistics was of the type reasonably relied upon by experts in the field of genetics and serology. *Contreras*, 246 Ill. App. 3d at 511.

We hold that, in the instant case, Finn's testimony was properly admitted under *Wilson* for the limited purpose of explaining the basis of her opinion. Conneally's review of the database was similar to the population databases in *Contreras* and was the type of information reasonably relied upon by experts in the field of forensic DNA analysis, genetics and serology. See *Contreras*, 246 Ill. App. 3d at 511. Furthermore, we conclude, as did the courts in *Lipscomb* and *Contreras*, that it was defendant's responsibility to challenge the reliability of the basis of Finn's statistics on cross-examination, as statistics are admissible as relevant to identification and any challenges to their reliability go only to the weight to be given the evidence. *People v. Contreras*, 246 Ill. App. 3d 502, 511 (1993); *People v. Lipscomb*, 215 Ill. App. 3d 413, 435 (1991).

We also note that defendant was tried before the bench and not a jury. Assuming, *arguendo*, that it was error to admit the disputed testimony, we must presume that the trial court considered only competent evidence unless the contrary appears affirmatively of record. *People v. Schmitt*, 131 Ill. 2d 128, 138-39, 545 N.E.2d 665 (1989). Our review of the record indicates that the trial court recognized the

---

[2]We recognize that Wahl, unlike Finn, conducted the Hardy-Weinberg equilibrium test on the databases. However, unlike Finn, Wahl had no independent knowledge of the procedures or information used by the authors of the studies upon which he relied to create the databases. Finn, on the other had, was one of three people who created the CPD's database that was used in the instant case. Furthermore, although she did not conduct the Hardy-Weinberg test on the database herself, our review of the record shows that she was able to generally discuss the basic concepts involved with the test.

potential hearsay problems inherent in the testimony. Thus we presume that the court properly weighed the testimony in its final determination. Accordingly, we hold that the testimony was properly admitted.

## III

■ Defendant also contends that the prosecution failed to prove him guilty beyond a reasonable doubt because the incriminating conclusion of the DNA probability testimony was inadmissible, there were no eyewitnesses to the crime, no weapon was found, he did not confess, and the blood spot on his pants did not conclusively prove that he committed the murder.

If, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, we must affirm the conviction. *People v. Collins*, 106 Ill. 2d 237, 261, 478 N.E.2d 267 (1985). In view of this standard, we conclude that there is sufficient evidence to support the trial court's verdict.

For the reasons cited herein, the judgment of the circuit court of Cook County is affirmed. As part of our judgment, we grant the State's request and assess defendant $150 as costs for this appeal.

Affirmed.

CAHILL and GORDON, JJ., concur.