THIRD DIVISION
AUGUST 27, 2008

No. 1-06-3463

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 01 CR 10786 |
| | ) | |
| SANDY WILLIAMS, | ) | The Honorable |
| | ) | Kenneth J. Wadas, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE GREIMAN delivered the opinion of the court:

Following a bench trial that included inculpatory deoxyribonucleic acid (DNA) evidence, defendant, Sandy Williams, was convicted of two counts of aggravated criminal sexual assault, aggravated kidnaping and aggravated robbery. He was subsequently sentenced to two concurrent terms of natural life imprisonment for the aggravated criminal sexual assault counts; a consecutive term of 60 years' imprisonment for the aggravated kidnaping count; and a concurrent term of 15 years' imprisonment for the aggravated robbery count. On appeal, defendant contends that the trial court erred in admitting the inculpatory DNA evidence because sufficient foundation was not established for the forensic scientist's opinion testimony on the matter. Defendant additionally contends that admission of the forensic scientist's opinion testimony violated defendant's confrontation rights according to Crawford v. Washington, 541 U.S. 36, 158 L. Ed. 2d 177, 124 S. Ct. 1354 (2004). Defendant finally contends that the trial court erroneously ordered that his aggravated kidnaping sentence run consecutive to his sentence of natural life imprisonment for aggravated criminal sexual assault.

The evidence adduced at trial demonstrated that, on February 10, 2000, defendant grabbed the 22-year-old victim, L.J., as she was walked home from work, forced her into a car and repeatedly sexually assaulted her. Once finished, defendant took the victim's money and some of her personal belongings and fled. The victim immediately ran home and reported the incident.

The victim later went to the hospital, where she provided a blood sample and a vaginal swab for a sexual assault kit (kit). Doctor Nancy Schubert sealed the samples in the kit and placed it in a secured lock box in the emergency room. Early the next morning, Detective Michael Baker obtained the kit from the emergency room and inventoried it prior to sending the kit to the Illinois State Police crime lab (Crime Lab) for testing and analysis.

Prior to going to the hospital, the victim spoke to the police and described defendant as a black male, standing 5 feet 8 inches tall, wearing a black skullcap, black jacket and jeans and driving a beige station wagon. The police subsequently issued a "flash" message including that description. Pursuant to the "flash" message, two officers stopped an individual matching the perpetrator's description. The suspect, James McChristine, agreed to accompany the officers to the hospital where the victim was being treated. The victim first viewed McChristine's driver's license and stated that there was potential that he was her attacker; however, she asked to view him in person. As a result, the victim viewed McChristine in the hospital parking lot and there was conflicting evidence presented as to whether the victim positively identified McChristine at that time. Notwithstanding, the victim again viewed McChristine at a police station thereafter and confirmed that McChristine was not her offender.

1-06-3463

Defendant was arrested on August 3, 2000, on an unrelated offense. While in custody, defendant was required to provide a blood sample for the police DNA database. John Duffy, an investigator for the State's Attorney's office, placed defendant's blood sample into a sealed envelope. Duffy then inventoried the sample and sent it to the Crime Lab for testing and analysis. In March 2001, a DNA "hit" was generated in the database linking defendant to the underlying offenses. As a result, on April 16, 2001, L.J. viewed a lineup and positively identified defendant as her attacker. Defendant was subsequently charged with the instant offenses.

Karen Kooi, a forensic scientist at the Crime Lab, testified that she received defendant's sealed blood sample on August 24, 2000, and performed a short tandem repeat (STR) analysis on a portion of the sample. Kooi obtained a DNA profile from the sample and entered it into the Crime Lab database, which is used to compare DNA profiles to blood samples from unsolved crimes. While extracting defendant's DNA profile from his blood sample, Kooi acted in accordance with the nationwide standards for DNA analysis.

Brian Hapack, a forensic scientist at the Crime Lab, testified that he received the victim's sealed kit on February 15, 2000, and performed two tests on the vaginal swabs in order to detect the presence of semen. First, Hapack conducted an acid phosphastase test and received the highest indication for semen, four plus positive. Next, Hapack conducted an Abacard test and again received a positive result for the presence of semen with two pink lines. Hapack guaranteed the accuracy of his results by working in a clean environment free from contamination and by ensuring that the tests functioned properly. Hapack did not perform any tests on the victim's blood sample. Thereafter, Hapack sealed both the vaginal swabs and the

blood sample in envelopes and placed them in a secure freezer in order to secure the evidence for future testing, as was a common practice in the scientific community.

Sandra Lambatos, a forensic scientist at the Crime Lab, testified, as an expert in forensic biology and forensic DNA analysis, that a procedure known as polymerase chain reaction (PCR) enables forensic examiners to extract a male DNA profile from semen, which could then be compared to the DNA from a suspect's blood in order to garner a statistical probability that the DNA matched.

In particular to the instant case, Lambatos testified that the victim's kit was sent, in a sealed condition, to Cellmark Diagnostic Laboratory (Cellmark), an accredited crime lab in Maryland, for further analysis. According to Lambatos, at the time, the Crime Lab commonly sent evidence samples to Cellmark to expedite analysis. The samples were sent via Federal Express, which was a generally accepted manner of transporting DNA evidence in the scientific community. A Crime Lab shipping manifest indicated that the victim's kit was shipped to Cellmark on November 28, 2000, in a sealed condition; was received by Cellmark on November 29, 2000; and was returned to the Crime Lab on April 3, 2001. According to Lambatos, the Crime Lab shipping manifest was generated in the ordinary course of business and was kept in a secure area of the lab.

Lambatos further testified that she used the comparison method described earlier to conclude that the semen obtained from the victim's vaginal swabs, as identified by Hapack, and the male DNA profile produced from defendant's blood sample, as identified by Kooi, were a match. The probability of the match was 1 in 8.7 quadrillion unrelated black individuals, 1 in

390 quadrillion unrelated white individuals and 1 in 109 quadrillion unrelated Hispanic individuals.

On cross-examination, Lambatos admitted that she was unaware of what happened to the Federal Express package containing the victim's kit when it arrived at Cellmark. Lambatos further admitted that she did not examine or perform any physical testing of the samples herself; rather, she based her opinion, in part, on the results generated by Cellmark. In particular, Cellmark provided a DNA profile for the semen recovered from the victim's vaginal swabs using electropherograms and allele charts. Although she did not personally observe Cellmark perform the tests on the evidence at issue, Lambatos averred that, because Cellmark was an accredited laboratory, it was required to meet "certain guidelines to perform DNA analysis for the Illinois State Police and so all those calibrations and internal proficiencies and controls [of the equipment used] would have had to have been in place for them to perform the DNA analysis." Lambatos, however, admitted that Cellmark had different procedures and standards for results than the Crime Lab. Nevertheless, Lambatos maintained that Cellmark analysts generally performed proficiency tests that she personally developed.

According to Lambatos, Cellmark's electropherogram tests revealed a mixture of DNA profiles; therefore, Lambatos opined that Cellmark subtracted the victim's profile, as generated from the vaginal swab, from the sample in order to deduce the male's DNA profile, namely, defendant's. Lambatos admitted that Cellmark's results demonstrated a minor presence for unaccounted genetic material, which she described as "white noise." Lambatos then entered the retrieved male DNA profile into the Crime Lab database to search for a match. Lambatos

admitted that it was possible to have a degraded evidence sample; however, she did not observe any evidence degradation in the instant case. According to Lambatos, she reviewed Cellmark's results; made her own interpretations; and formed her own opinion of the evidence.

On redirect examination, Lambatos clarified that the results demonstrating a mixture only produced DNA profiles for the victim and defendant. In her expert opinion, Lambatos stated that Cellmark's testing and analysis methods were generally accepted in the scientific community. Lambatos further testified that she routinely relied on results from Cellmark and she did not observe any problems with the chain of custody or contamination of the evidence at issue.

At the conclusion of Lambatos' testimony, defense counsel moved to exclude that portion of her testimony related to Cellmark's testing based upon Crawford and a lack of established foundation. In particular, defense counsel argued that the evidence presented lacked a suitable foundation in terms of the chain of custody; who handled the evidence; how the equipment was calibrated; how the tests were run; and what procedures were followed. Following the parties' arguments, the trial court concluded that Crawford was inapplicable. In so ruling, the court stated:

> "I've read a lot of memorandums of law about Crawford. The premier memorandum is written by Appellate [C]ourt [J]ustice Quinn. I've read his memorandum, his updated memorandum which he updates every year. I don't think this is a Crawford scenario, and I agree with the State that the evidence is – the issue is, you know, what weight do you give the test, not do you exclude it and accordingly your motion to exclude or strike the testimony of the last witness or opinions based on her own independent testing of the data

received from Cel[l]mark[1] will be denied."

The trial court ultimately found defendant guilty as previously described. The court subsequently denied defendant's motion for a new trial and proceeded to sentencing. In aggravation, the State presented the testimony of G.M., an individual whom defendant kidnaped, repeatedly raped and robbed in 1984. Defendant's criminal record further demonstrated that he was paroled for those offenses, including aggravated criminal sexual assault, in February 1997 and was discharged from parole on February 4, 2000, less than a week before the instant offense. Following additional evidence in aggravation and mitigation, the court sentenced defendant to two concurrent terms of natural life imprisonment for the aggravated criminal sexual assault counts; a consecutive term of 60 years' imprisonment for the aggravated kidnaping count; and a concurrent term of 15 years' imprisonment for the aggravated robbery count. Thereafter, the court denied defendant's motion to reconsider that sentence. This timely appeal followed.

Defendant first contends that the trial court erred in admitting the DNA evidence produced by Cellmark where a sufficient foundation was not established to demonstrate that the equipment used was adequately calibrated and properly functioning, and where the State failed to establish a sufficient chain of evidence based upon Cellmark's handling of the evidence.

At the outset, we note that neither argument was waived for purposes of our review. Despite the State's insistence that defendant expressly waived review of his chain of custody argument, our review of the record reveals that defense counsel included the issue in his oral motion to exclude Lambatos' testimony and in his posttrial motion as well. See People v. Enoch,

---

[1]According to the parties, the transcript reflects an improper spelling of the laboratory.

1-06-3463

122 Ill. 2d 176, 186 (1988).  Accordingly, we review defendant's arguments.

The admission of Lambatos' expert testimony was within the trial court's sound discretion; therefore, we will not overturn that decision absent an abuse of discretion.  People v. Eyler, 133 Ill. 2d 173, 211 (1989).

In Wilson v. Clark, 84 Ill. 2d 186 (1981), our supreme court adopted Rule 703 of the Federal Rules of Evidence, holding that an expert may offer an opinion based upon facts not in evidence if those facts are "of a type reasonably relied upon by experts in the particular field." People v. Raney, 324 Ill. App. 3d 703, 706 (2001), citing Wilson, 84 Ill. 2d at 193.  Moreover, where expert testimony is based upon an electronic or mechanical device, the expert must provide some foundational proof that the device was functioning properly at the time it was used. Raney, 324 Ill. App. 3d at 710-11; People v. Bynum, 257 Ill. App. 3d 502, 514 (1994). Notwithstanding, in a post-Bynum and post-Raney decision, this court approvingly cited People v. Hill, 169 Ill. App. 3d 901 (1988), for the proposition that a chemical analyst need not personally determine the reliability of the instrument being used to perform the evaluation at issue.  People v. Rucker, 346 Ill. App. 3d 873, 890 (2003), citing Hill, 169 Ill. App. 3d at 911. Thereafter, it is the defendant's responsibility to challenge the sufficiency or reliability of the basis for the expert's opinion during cross-examination, and the determination of the weight to be given that expert's opinion is left to the finder of fact.  Adams v. Family Planning Associates Medical Group, Inc., 315 Ill. App. 3d 533, 550 (2000), citing People v. Lipscomb, 215 Ill. App. 3d 413, 435 (1991).

In the case at bar, Lambatos was qualified, without objection, as an expert in forensic

biology and forensic DNA analysis and concluded, based upon her expertise, Kooi's analysis of defendant's blood, Hapack's analysis of the semen found on the victim's vaginal swabs and Cellmark's report detailing the DNA profile generated from the semen on the victim's vaginal swabs, that the semen belonged to defendant. Although she admittedly did not perform the actual tests on the evidence, Lambatos familiarly testified regarding the PCR procedure, which was used to extract the male DNA profile from the semen found on the vaginal swabs. Moreover, Lambatos repeatedly averred that Cellmark was an accredited laboratory and therefore was required to follow specified guidelines in order to perform DNA analysis. Lambatos additionally provided that Cellmark's testing and analysis methods were generally accepted in the scientific community, so much so that she routinely relied on Cellmark's facility. Accordingly, despite Lambatos' inability to speak to the precise conditions of Cellmark's equipment and testing of the instant samples, we find that she provided a sufficient foundation upon which to partially base her assessment and conclusion. See People v. Sutherland, 223 Ill. 2d 187, (2006) (where the supreme court dismissed the same argument because the defendant did not mount a challenge against the facts relied upon by the expert as not typically relied upon in the relevant field).

Defendant relies heavily on Raney to support his argument that the foundation was inadequate because Lambatos could not testify that Cellmark's equipment was calibrated and working properly. Raney, 324 Ill. App. 3d at 710-11. The Raney court, however, recognized that it may not be feasible to require that an expert personally test the instrument relied upon for making the relevant determination. Raney, 324 Ill. App. 3d at 710. Moreover, the instant case is

distinguishable from <u>Raney</u> in that Lambatos provided "some foundational proof as to the fact that the instrument was functioning properly at the time it was used" (<u>Raney</u>, 324 Ill. App. 3d at 710), where she maintained that Cellmark's testing necessarily met the threshold of proper DNA analysis. In comparison, the expert in <u>Raney</u> did not provide any testimony that the machine used was calibrated and working properly or how she knew its results were accurate. <u>Raney</u>, 324 Ill. App. 3d at 710. Consequently, defendant's argument is based upon pure speculation that the equipment may not have been working properly, and such speculation is best tested during cross-examination. See <u>Adams</u>, 315 Ill. App. 3d at 550. The record reveals that defense counsel thoroughly cross-examined Lambatos on the basis of her opinion. Accordingly, the issue of Lambatos' reliance on Cellmark's report went to the weight of her opinion and not its admissibility. The trial court assessed the weight of Lambatos' testimony and clearly found it convincing.

We next turn to defendant's argument regarding the chain of custody of the victim's kit. Specifically, defendant argues that the State failed to demonstrate a sufficient chain of evidence because it did not offer any evidence regarding whether Cellmark "employed protective measures to guard against contamination of the samples."

Where physical evidence is not readily identifiable or may be susceptible to tampering, contamination or exchange, the State is required to establish a chain of custody "that is sufficiently complete to make it improbable that the evidence has been subject to tampering or accidental substitution." <u>People v. Woods</u>, 214 Ill. 2d 455, 467 (2005). Our supreme court further instructed:

"Unless the defendant produces evidence of actual tampering, substitution or contamination, a sufficiently complete chain of custody does not require that every person in the chain testify, nor must the State exclude every possibility of tampering or contamination; the State must demonstrate, however, that reasonable measures were employed to protect the evidence from the time that it was seized and that it was unlikely that the evidence has been altered." Woods, 214 Ill. 2d at 467.

In those circumstances, any deficiencies in the chain of custody are considered against the weight of the evidence and not its admissibility. Woods, 214 Ill. 2d at 467.

In the case at bar, defendant does not take issue with the chain of custody of the victim's kit prior to its transport to Cellmark; therefore, we focus only on that portion of the chain. Lambatos testified that the Crime Lab kept a shipping manifest in the ordinary course of business in a secure area which detailed the arrival and departure of specified evidence samples. In regard to the relevant evidence here, the shipping manifest reflected that the victim's kit was sent to Cellmark on November 28, 2000, in a sealed condition via Federal Express, a generally accepted manner of transporting DNA evidence within the scientific community; was received by Cellmark the next day; and was returned to the Crime Lab on April 3, 2001. Lambatos was unaware of the express condition of the samples when they arrived at Cellmark; however, based on her expertise, Lambatos testified that the sample did not show any signs of degradation. We are not persuaded by defendant's argument that the chain of custody was inadequate because no Cellmark analyst testified regarding the condition and handling of the samples, where Lambatos testified regarding the reasonable measures employed to safeguard the evidence. See Woods,

214 Ill. 2d at 467 (every person in the chain of custody need not testify). Accordingly, the State established a *prima facie* demonstration that the chain of custody was sufficient.

Defendant briefly argues that the State could not establish a chain of custody based upon the shipping manifests because they were inadmissible business records produced for purposes of litigation in violation of section 115-5(c)(2) of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-5(c)(2) (West 2006)). Defendant, however, has waived review of this argument where he barely mentioned it and did not cite to any relevant authority outside the statute, in violation of Supreme Court Rule 341(h)(7) (210 Ill. 2d R. 341(h)(7)). "A reviewing court is entitled to have issues clearly defined with pertinent authority cited and cohesive arguments presented [citation], and it is not a repository into which an appellant may foist the burden of argument and research [citation]; it is neither the function nor the obligation of this court to act as an advocate or search the record for error." Obert v. Saville, 253 Ill. App. 3d 677, 682 (1993).

Defendant further argues that he sufficiently rebutted the State's *prima facie* case because he presented evidence of contamination *vis-a-vis* Cellmark's reported mixture of DNA profiles and presence of unaccountable genetic material. We disagree. Lambatos clearly testified that the mixture at issue was a combination of only defendant's and the victim's DNA profiles. Moreover, in regard to the unaccounted-for genetic material, Lambatos categorically designated it "white noise." Consequently, we do not find that defendant presented sufficient evidence to suggest that the samples were tampered with or contaminated. Accordingly, Lambatos' testimony regarding Cellmark's testing and analysis was properly admitted on the basis of the State's sufficient chain of custody.

Defendant next contends that the results of Cellmark's testing and analysis were testimonial in nature and therefore Lambatos' expert testimony in reference thereto violated defendant's constitutional right to confrontation, where no Cellmark representative was presented for cross-examination. The State responds that Lambatos' testimony regarding Cellmark's analysis was not testimonial hearsay, and thus, defendant's confrontation rights were neither implicated nor violated.

In People v. Spicer, 379 Ill. App. 3d 441 (2007), this court recently provided that, where a defendant claims that a trial court admitted a hearsay statement in violation of the confrontation clause, we defer on review to the trial court's evidentiary ruling unless that discretion has been frustrated by an erroneous ruling of law. Spicer, 379 Ill. App. 3d at 451.

Pursuant to Crawford, "[w]here testimonial statements are at issue, the only indicum of reliability sufficient to satisfy constitutional demands is the one the Constitution actually proscribes: confrontation." Crawford, 541 U.S. at 68-69, 158 L. Ed. 2d at 203, 124 S. Ct. at 1374. Hence, since no Cellmark representative was available for cross-examination, the purported question before us is whether Cellmark's report constituted improper testimonial evidence. Crawford, however, reiterated that "the [Confrontation] Clause also does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted. See Tennessee v. Street, 471 U.S. 409, 414, 85 L. Ed. 2d 425, 431, 105 S. Ct. 2078, 2081-82 (1985)." Crawford, 541 U.S. at 59 n.9, 158 L. Ed. 2d at 197, 124 S. Ct. at 1370. As a result, we must initially determine whether Lambatos' reliance on the Cellmark results was hearsay. See Spicer, 379 Ill. App. 3d at 449 ("hearsay analysis and sixth amendment analysis are completely

1-06-3463

different").

Hearsay generally prohibits the introduction of an out-of-court statement offered to prove the truth of the matter asserted therein. Spicer, 379 Ill. App. 3d at 449. However, underlying facts and data may be disclosed by an expert, not for the truth of the matter asserted, but for the purpose of explaining the basis of his opinion. People v. Nieves, 193 Ill. 2d 513, 528 (2000), citing People v. Pasch, 152 Ill. 2d 133, 176 (1992); People v. Almighty Four Hundred, 287 Ill. App. 3d 123, 132 (1997). Moreover, "[i]t is well established that an expert may testify about the findings and conclusions of a nontestifying expert that he used in forming his opinions." People v. Jones, 374 Ill. App. 3d 566, 579-80 (2007).

Defendant argues that Cellmark's report was inadmissible hearsay because it was necessarily offered for the truth of the matter asserted where Lambatos could not conclude that defendant's semen was present on the victim's vaginal swabs absent the DNA profile generated by Cellmark. We disagree. Cellmark's report was not offered for the truth of the matter asserted; rather, it was offered to provide a basis for Lambatos' opinion. Lambatos clearly testified that she performed her own evaluation of the data, which included Kooi's findings, Hapack's findings and Cellmark's report, prior to forming her opinion.

In Almighty Four Hundred, this court provided:

"[a]n expert witness may base his or her opinion on information that has not been admitted into evidence so long as that information is reliable and is of a type reasonably relied upon by experts in that field. Rule 703 did not, however, create an exception to the hearsay rule. [Citation]. The underlying facts or data upon which an expert in a

-14-

particular field is found to have reasonably relied are not admitted for their truth.
[Citation]. Rather, these facts are admitted for the limited purpose of explaining the basis
for the expert witness' opinion. [Citation]. Furthermore, it is for the circuit court, in the
exercise of its discretion, to determine whether the underlying facts or data upon which an
expert bases an opinion are of a type reasonably relied upon by experts in the particular
field." Almighty Four Hundred, 287 Ill. App. 3d at 132.

Similar to the facts of Lipscomb, Lambatos relied on Cellmark's report, which included data of
the type generally relied upon by experts in the field. Lipscomb, 215 Ill. App. 3d at 435 (the
expert's opinion was properly admitted even though it was based on a final report which included
data generated by individuals that did not testify).

Moreover, defense counsel vigorously cross-examined Lambatos regarding her opinion
and was free to call another expert to dispute that opinion. It was, therefore, the trial court's duty
to determine the weight of Lambatos' testimony. Adams, 315 Ill. App. 3d at 550. Furthermore,
the record does not affirmatively show that the instant trial judge considered anything but
competent evidence. People v. Schmitt, 131 Ill. 2d 128, 138-39 (1989) (a trial judge is presumed
to consider only competent evidence unless the record affirmatively demonstrates otherwise). On
the contrary, defendant objected to Lambatos' testimony and the Honorable Kenneth Wadas
entertained arguments on the matter, yet determined that the opinion based on Cellmark's reports
was admissible. Simply put, the report was not introduced to prove the truth of Cellmark's
results consequently the Confrontation Clause was not violated. Crawford, 541 U.S. at 59 n.9,
158 L. Ed. 2d at 197, 124 S. Ct. at 1370. Further, because we have already determined that it

1-06-3463

was reasonable for Lambatos to rely on Cellmark's report, we find that Lambatos' testimony regarding the Cellmark report was properly admitted to assist in explaining the basis of her ultimate opinion. See Nieves, 193 Ill. 2d at 528.

Overall, defendant essentially requests that we require each and every individual involved in the testing and analysis of DNA to testify at trial. For obvious reasons in the abstract and for those provided in the case at bar, we decline to issue such a ruling.

Defendant finally contends that the trial court erred in sentencing him to a term of imprisonment consecutive to his term of natural life. The State responds that the plain language of section 5-8-4 of the Unified Code of Corrections (Code of Corrections) (730 ILCS 5/5-8-4 (West 2006)) and section 12-14 of the Criminal Code of 1961 (Criminal Code) (720 ILCS 5/12-14 (West 2006)) require that defendant's prison term for aggravated kidnaping run consecutive to his term of natural life for aggravated criminal sexual assault.

Although the imposition of a sentence is within a trial court's discretion, we review the propriety of defendant's sentence *de novo* because it involves a question of law.[2] People v. Chaney, 379 Ill. App. 3d 524, 527 (2008).

Section 5-8-4 of the Code of Corrections provides that a "court shall impose a consecutive sentence" if a defendant was convicted of a violation of section 12-14 of the Criminal Code. 730 ILCS 5/5-8-4(a)(ii) (West 2006). Moreover, pursuant to section 12-14(d)(2) of the Criminal Code, an individual, like the instant defendant, who has been convicted of aggravated criminal sexual assault after having been previously convicted of aggravated criminal

---

[2]We note that neither party provided the proper standard of review for this issue.

-16-

1-06-3463

sexual assault "shall be sentenced to a term of natural life imprisonment." 720 ILCS 5/12-14(d)(2) (West 2006).

In People v. Dixon, 366 Ill. App. 3d 848 (2006), this court resolved the question before us and in People v. Spears, 371 Ill. App. 3d 1000 (2007), this third division approvingly cited and relied on Dixon to resolve the same issue. Following the supreme court's logic in People v. Palmer, 218 Ill. 2d 148 (2006), that, under the principles of natural law and within the plain meaning of the consecutive sentencing statute, only one natural life sentence may be served, we concluded that a term of years could not be served consecutive to a term of natural life because a defendant is only capable of serving one natural life sentence. Spears, 371 Ill. App. 3d at 1008; Dixon, 366 Ill. App. 3d at 856, citing Palmer, 218 Ill. 2d at 164. "His natural life sentence without parole means that he will remain in prison for the remainder of his life and at the conclusion of this sentence, his life is over." Spears, 371 Ill. App. 3d at 1008. Consequently, the instant defendant, like that in Spears, cannot serve a 60-year term at the conclusion of his term of natural life. Accordingly, pursuant to Supreme Court Rule 615(b)(4) (134 Ill. 2d R. 615(b)(4)), we vacate that portion of the trial court's order sentencing defendant to consecutive terms of natural life and 60 years' imprisonment and modify his sentence to reflect concurrent terms.

Based on the foregoing, we affirm the judgment of the circuit court of Cook County in relation to defendant's convictions. We vacate that portion of the circuit court's order imposing consecutive sentences for aggravated criminal sexual assault and aggravated kidnaping, and instead modify defendant's sentence to impose concurrent sentences for those convictions.

Affirmed in part and vacated in part; sentence modified.

-17-

1-06-3463

QUINN, P.J., concurs.

CUNNINGHAM, J., dissents.


JUSTICE CUNNINGHAM dissenting:

Because I believe the complete failure to lay a sufficient foundation should have barred a key State witness from presenting critical DNA testimony, I must respectfully dissent.

This analysis requires some clarification of the facts of the case. The attack on the victim occurred on the night of February 2, 2000. A man grabbed the victim from behind, forced her into a beige station wagon, robbed her, sexually assaulted her, and then pushed her out of the car. That same evening the police stopped a man in a car near the crime scene who matched the victim=s description of her assailant. According to police testimony, this man voluntarily accompanied them to the hospital where the victim was being treated. When shown the man=s driver=s license photograph, the victim said he looked like her assailant, but she told the police officer that she wanted to see the man in person. A police officer took the victim to the hospital parking lot where the man was being held. That police officer testified at trial that when the victim observed this man, she positively identified him as her attacker. The police officer=s testimony was contradicted by the victim, who claimed that in the hospital parking lot she first saw the man sitting in a police car, and she had some doubts about whether he was her assailant. The police then took the man out of the car and she told them he was not her assailant. Although the victim claimed that she told the police officer that the man was not her assailant, nonetheless, it is undisputed that the police subsequently took her to the police station to look at the man

-18-

again, at which time she said he was not her assailant. No DNA material was taken from this man. *Fourteen months passed before the victim first identified another man, the defendant Williams, in a lineup, as her assailant.* She had never seen the defendant before she was attacked.

The eyewitness testimony of the victim, if believed by the trier of fact without additional bolstering evidence, may meet the State=s burden of proof of the defendant=s guilt beyond a reasonable doubt. People v. Bannister, 378 Ill. App. 3d 19, 39, 880 N.E.2d 607, 625 (2007); see People v. Smith, 185 Ill. 2d 532, 545, 708 N.E.2d 365, 371 (2007) (stating this proposition of law, but reversing the conviction outright because of serious impeachment of the eyewitness which resulted in the State failing to meet its burden of proof). In this case the testimony of the victim, although impeached by her initial contradictory identification of another man as her assailant, could have been sufficient evidence of the defendant=s guilt. But it is clear that the State=s strongest evidence, which greatly bolstered the victim=s testimony, was the testimony of the Illinois State Police Crime Lab=s forensic scientist, Sandra Lambatos.

Lambatos testified that the DNA in vaginal swabs of semen recovered from the victim matched the defendant=s DNA. She described the odds of this match occurring as 1 in 390 quadrillion for white people, 1 in 8.7 quadrillion for black people and 1 in 109 quadrillion for Hispanic people. If valid, this is devastating evidence whether it is heard by a jury or a judge. The problem is that this testimony should never have been admitted because the State never established a proper foundation for its admission.

This court has repeatedly set out the foundation required before an expert may give his or

her opinion based upon machine-generated results which are not in evidence. The State must establish a foundation which includes some evidence that the machine producing those results was functioning properly when it was used for testing. People v. Raney, 324 Ill. App. 3d 703, 709-11, 756 N.E.2d 338, 343-45 (2001); People v. Bynum, 257 Ill. App. 3d 502, 513-14, 629 N.E.2d 724, 732-34 (1994). The defendant in Raney was convicted of possession of cocaine with intent to deliver. A State forensic scientist from the Illinois State Police Crime Lab (Crime Lab) testified that she had used a gas chromatography mass spectrometer (GCMS) to determine that substances recovered from the defendant were cocaine. The witness testified that the results of GCMS testing were generally relied upon by experts in her field and that the testing she utilized was generally accepted in the scientific community. But she failed to provide any evidence that the GCMS she used was operating properly. Nor did she testify that she had done any testing to verify its accuracy or to determine that it was in good operating condition. Raney, 324 Ill. App. 3d at 707- 09, 756 N.E.2d at 342-44. Raney had preserved this issue by objecting to the witness= qualification as an expert, and by moving for a directed finding based upon a lack of foundation for this evidence. Because there was no competent evidence that Raney was in possession of illegal drugs, we reversed his conviction outright for lack of sufficiency of the evidence. We first set out this standard in Bynum, holding that an insufficient foundation was laid for the opinion of an expert witness concerning the nature of drugs recovered from the defendant because the State=s expert did not testify that the GCMS was generally relied upon by experts in the field. The expert also failed to testify regarding how the machine was calibrated or how she knew the results of this analysis were correct. Bynum, 257 Ill. App. 3d at 513-14, 629

1-06-3463

N.E.2d at 732.  However we then found this issue to have been waived by the defendant because he did not object to it at trial.  Bynum, 257 Ill. App. 3d at 514-15, 629 N.E.2d at 732-34.

As the majority notes, in the case before us there is no question of waiver or forfeiture. The defendant properly preserved these issues by contemporaneous objection at trial and in his motion for a new trial.  Accordingly,  the holding of Raney is directly applicable to this case. Over the defendant=s objection, forensic scientist Sandra Lambatos was permitted to testify that the defendant=s DNA matched the vaginal swabs taken from the victim and that the odds against this occurring randomly were astronomical.  But the foundation testimony in this case was even weaker than that in Raney.  Unlike the testifying scientist in Raney, Lambatos did not perform or even observe the critical procedure which was allegedly used to isolate the defendant=s DNA.  In fact Lambatos had no knowledge of whether the machine used in the testing was functioning and whether it was accurately calibrated, or anything else about it.  Neither did she personally know anything about *any* of the procedures used in the laboratory where the testing was done.  The DNA data identified as the defendant=s which was provided to Lambatos by the Cellmark Laboratory (Cellmark) was taken from the vaginal swabs of the victim.  This sample was sent to Cellmark, an out-of-state laboratory in Maryland.  Once it was mailed there, Lambatos knew nothing of how the material was handled or tested.  She knew only that she subsequently received test results back from Cellmark. She merely matched the defendant=s DNA as provided to her by Cellmark to the DNA later recovered from the defendant.  As the State conceded in oral argument before this court, Lambatos could not have reached her conclusion without relying on the tests performed by technicians at Cellmark.

1-06-3463

Lambatos did not observe the tests done by Cellmark, nor could she state that the tests were done in accordance with established protocols or accurate calibrations. She could only state that as an accredited laboratory, Cellmark was required to meet certain guidelines. She obviously could not testify that these guidelines were followed in this particular case. She also admitted that genetic material other than that of the defendant or the victim had been found in the tested material at Cellmark, although she dismissed this as Abackground noise.@ Like the expert witness in Raney, Lambatos did not testify regarding whether the test upon which her opinion was based had been properly performed, with proper calibrations and safeguards. Again like the witness in Raney, she did testify that the type of procedure used by Cellmark was generally accepted in the scientific community, but this failed to demonstrate that the testing procedure in this particular case was properly performed.

These are not idle concerns. DNA evidence is powerful because it always appears to be based on pure science. It can convict the guilty or free the innocent. The importance of DNA evidence has been highlighted in society at large. Courts have been known to take judicial notice that improperly performed DNA tests have resulted in wrongful convictions. In Brown v. Farwell, 525 F.2d 787, 796-97 (9th Cir. 2008), the district court=s decision granting the defendant=s *habeas corpus* petition was affirmed because the defendant presented expert testimony establishing that the State=s DNA expert at trial had grossly exaggerated the odds that the defendant was the assailant. In Houston, Texas, the police crime laboratory temporarily shut down its DNA laboratory and faced the prospect of retesting DNA samples in thousands of criminal cases because of a State audit which revealed misinterpreted data, poorly trained

-22-

1-06-3463

workers, shoddy records, and a leaky roof which contaminated evidence. A.. Liptak and R. Blumenthal, *New Doubt Cast on Crime Testing in Houston Cases*, New York Times, August 5, 2004. It was reported that at least one defendant was wrongly convicted of rape and served four years in prison before he was exonerated and released. In addition, in a preliminary review and retesting of 360 DNA cases, experts were unable to confirm the original results in 18 cases. Further, many criminal convictions have been reversed and remanded for new trials because of improper DNA evidence. Annotation, *Admissibility of DNA Identification Evidence*, 84 ALR 4th 313, Section 10 (1991).

In this case, the record clearly establishes that an insufficient foundation was presented concerning whether proper procedures and protocols were followed in testing by Cellmark, located in Maryland. The majority refers to Lambatos= generalized testimony concerning the sufficiency of the protocols, testing, and methods of analysis ordinarily followed by Cellmark. The majority also refers to Lambatos= testimony that Cellmark=s methods were generally accepted in the scientific community. But none of this testimony applied to the testing done by Cellmark in this case. Lambatos had no knowledge of what occurred at Cellmark with respect to the testing in this case . Indeed there was no evidence that she had any personal knowledge regarding how Cellmark and its staff conducted their work. The cases cited establish that absent a proper foundation, it was error to permit the expert testimony of forensic scientist Lambatos concerning a match between the defendant=s DNA and the DNA found in the samples taken from the victim.

In light of the case law cited, the majority equivocates. It spends a great deal of time in

1-06-3463

an exhaustive summary of the DNA testimony presented at trial. But the fundamental fact that cannot be avoided is that the State=s expert, Lambatos, had to rely on Cellmark technicians= testing which allegedly identified the defendant=s DNA in the victim=s sample. As previously noted, in oral argument the State conceded that without the DNA profile produced at Cellmark, Lambatos could not have testified to a match between the defendant=s DNA and that found in the material taken from the victim. Lambatos simply compared that DNA profile to one obtained from the defendant=s blood and found a match.

Faced with case law concerning the necessary foundation for evidence derived from scientific testing, which the majority appears to admit continues to be good law in this State, the majority cites to numerous inapplicable cases. They are all inapplicable for a number of reasons. For example, there was a determination that the defendant had waived the issue of the sufficiency of a foundation for evidence of scientific testing (People v. Sutherland, 223 Ill. 2d 187, 237, 860 N.E.2d 178, 279 (2006)); the defense stipulated to the validity of the testing procedure (People v. Rucker, 346 Ill. App. 3d 873, 892-94, 803 N.E.2d 31, 46-47 (2003)); the expert who performed the testing actually testified in court concerning the validity of that test (People v. Hill, 169 Ill. App. 3d 901, 910-11, 524 N.E.2d 604, 610-11 (1988)). In the case before us there was no forfeiture or waiver, no stipulation, and no testimony by the technicians who performed the critical test

I also note that there was insufficient chain-of-custody evidence presented by the State concerning the materials tested by Cellmark. The evidence established that materials were sent by Federal Express from the Illinois Crime Lab to Cellmark in Maryland along with samples

-24-

from twenty other cases. It was received in Maryland on November 29, 2000. The evidence also established that the Crime Lab received test results back from Cellmark by Federal Express on April 3, 2001. But no witness could account for the manner in which this material was kept or treated at Cellmark for the 126 days that it was there. In that period there were many ways in which the materials could have been compromised. Under cross-examination by the defense, forensic scientist Karen Abbinanti, who performed the DNA testing on the defendant=s blood at the Illinois Crime Lab, provided numerous examples of possible sources of contamination. Abbinanti testified that a sample could be contaminated if someone sneezed on it or dripped sweat on it. There could be cross-contamination from other samples. To guard against these possibilities, she said that she used a clean technique. Lab personnel wore lab coats, masks and gloves. Before examining material, they would clean their area with a ten percent bleach solution and in between examinations would clean their instruments with the same solution. Prior to performing her testing, Abbinanti also checked the calibration of the instrument she used. The record is absolutely silent as to whether any of these precautions were taken at Cellmark in this case, or whether any contaminating incidents occurred. We do know, according to forensic scientist Lambatos, that the sample she received back from Cellmark also contained genetic material not consistent with that of either the victim or the defendant. Lambatos testified that she did not believe it came from a third person, but was merely Abackground noise@ generated by the sensitive testing. Nonetheless we have genetic material tested by technicians yielding so called Abackground noise@ yet those technicians did not testify as to their methods, safety procedures or calibration of instruments. We have genetic material that may have been

1-06-3463

contaminated, and we have the trial court=s refusal to allow the defense to obtain the testimony of the technicians who actually performed the testing at Cellmark.

As cited by the majority, the law is that physical evidence which is susceptible to tampering or contamination requires the State to establish a chain of custody that makes it improbable that such tampering or contamination occurred. People v. Woods, 214 Ill. 2d 455, 466-67, 828 N.E.2d 247, 255 (2005). Not every person who handled the evidence must testify, but the State must establish that reasonable measures were used to protect the evidence from the time it was obtained. Clearly this burden was not met by the State in this case. There is absolutely no testimony or evidence concerning the manner in which the sample was treated or tested during the 126 days that it was under the control of Cellmark. Adhering to proper foundational procedure is critical when DNA evidence is presented. Such evidence is powerfully persuasive. In a case like this, where the identification testimony is weak, special care is necessary to ensure that all aspects of the required foundational process have been followed.

Finally, the majority suggests that it may not have been Afeasible@ to require the expert who testified, Lambatos, to personally test the instrument relied upon. This presents a false choice and undermines the importance of established law on this issue. The issue is whether the *technicians who performed the test* were required to testify. This was a case in which a conviction would necessarily result in a sentence of life in prison without the possibility of parole. Under these circumstance, the importance of adhering to the tenets of well settled law cannot be overstated. In this bench trial, I can fathom no legitimate reason for the trial court to refuse to allow the defendant to avail himself of this fundamental procedural safeguard. The

court could have postponed the remainder of the trial to allow the defense to subpoena the Cellmark technicians who performed the DNA test. Given what is at stake, slight inconvenience to the State or the trial court should not be the overriding factor. The failure to do this, in my judgment has resulted in a grievous error requiring reversal and remand for a new trial. In so finding, I must also comment on the State=s effort to muddy the waters by including in their brief, copious, irrelevant facts concerning other crimes committed by the defendant. But, the only reason to include those details would have related to an issue regarding sentencing. The only sentencing issue in this case, the validity of a term sentence imposed consecutive to a life sentence, required no detailed description of the defendant=s prior offenses.

For all these reasons, I would reverse and remand for a new trial.